# Office of Bar Counsel

Mark W. Gifford

Fits and Starts: Initiatives to Expand Legal Services by Nonlawyers Travel a Bumpy Road

As fewer and fewer consumers of legal services are able to afford a lawyer, those in need of legal assistance look elsewhere or go it alone. This virtual death spiral imposes additional burdens on an already-clogged justice system and carries the potential for significant, perhaps irreparable harm to the unrepresented or self-represented consumer.

A number of jurisdictions across the country have tried innovative approaches to bridging the gap between consumer needs and the ability of the legal system to deliver. Several are showing early signs of promise. However, the earliest experiment in regulatory innovation to expand the availability of legal services to those in need was scrapped in 2020 after just five years of little progress. Though regulatory reform efforts are still in their infancy, there is something to be learned from the failure of Washington's initiative to authorize and regulate Limited License Legal Technicians (LLLTs), as contrasted with the early success of the Utah Office of Legal Services Innovation's Sandbox.

Washington's Failed LLLT Program

In 2012, Washington pioneered the adoption of regulatory reform measures to expand access to legal services by allowing LLLTs who satisfied stringent licensure requirements to practice within family law. The initiative's launch met with a predictable chorus of jeers and catcalls from lawyers who foresaw the problems that would be experienced by clients receiving substandard legal assistance.

LLLTs were required to complete a specified family law curriculum and have 3,000 hours of practical legal experience. The first LLLTs were granted licenses in 2015 and were recognized as members of the Washington State Bar Association. So far, so good.

But the fledgling program didn't gain traction. Few applicants sought licensure. In an effort to shore up the initiative, a LLLT board proposed expanding the areas of law LLLTs could practice to include elder care, health law, administrative law, eviction and debt assistance. All such efforts were rejected by the Washington Supreme Court.

By 2020, just 45 LLLT licenses had been awarded, only 39 of which identified as active. By then, the bar's elected leadership had turned over and the composition of the court had changed. Detractors cited the cost of administering the program—more than $1.4 million—compared with the small yield in benefits. Supporters of the program shrugged off such criticism as mere "turf protection" by lawyers who feared that their market share would be eroded by LLLTs.

At a June 4, 2020, en banc administrative meeting, seven of nine justices voted to sunset the program. Those already granted LLLT licensure could remain in practice. Those in training who completed licensure requirements by July 31, 2022, would be eligible for LLLT admission. No licenses would be issued after that date.

Utah's Sandbox

In 2018, Utah became the second jurisdiction to authorize limited practice by non-lawyers when it launched a Licensed Paralegal Practitioner (LPP) program. Noting Washington's struggle to attract limited license practitioners, Utah authorized LPPs to practice family law, forcible entry and detainer, and small debt collection. Two years later, the Utah Supreme Court embarked on a more ambitious and audacious venture dubbed "the Sandbox," through which qualifying businesses would be eligible to provide an openended array of legal services with or without lawyer involvement.

In August 2020, the court established an Office of Legal Services Innovation charged with regulating businesses granted entry into the Sandbox. Entities wanting to play in the Sandbox must submit a detailed application with the following information:

• Description of the legal services to be offered, including (1) who provides the legal services, (2) how consumers will access/ receive those services, and (3) what the entity's service will do for its customers

• Explanation of the provider's product innovations that are not available under the traditional rules governing the practice of law

• Identification of the entity's target market of consumers

• Description of the service model that will be used (e.g., lawyers managed or employed by a nonlawyer; lawyers sharing fees with nonlawyers; nonlawyer provider without lawyer involvement; software provider without lawyer involvement)

• A full and candid discussion of the risks consumers might face if they use the proposed model (e.g., consumers receive inappropriate or otherwise flawed legal results, fail to exercise legal rights through ignorance or bad advice, or purchase an unnecessary or inappropriate legal service)

• Description of the business's consumer complaint process

To be eligible for the Sandbox, disbarred or suspended lawyers may not own more than 10% of the entity. Out-of-state lawyers cannot use the Sandbox to circumvent Utah's multijurisdictional practice rules.

Sandbox applications are reviewed by the Innovation Office. Once the office is satisfied that the entity meets eligibility criteria, a recommendation is made to the Utah Supreme Court, which is vested with full discretion as to whether and with what scope the recommended entity is authorized to provide legal services to Utah consumers. The court's authorization will include a description of the entity's ongoing disclosure and reporting requirements as well as identification of the entity's risk category.

An approved Sandbox entity's ongoing reporting and disclosure requirements vary depending on the entity's assigned risk category: High (nonlawyer provider without lawyer involvement or software provider without lawyer involvement), Moderate (nonlawyer provider with lawyer involvement or software provider with lawyer involvement), Low/Moderate (lawyers sharing fees

with nonlawyers or more than 50% nonlawyer ownership), or Low (lawyer employed or managed by a nonlawyer, less than 50% nonlawyer ownership, or software provider with lawyer involvement for legal document preparation). Once admitted to the Sandbox, the entity is subject to reapplication and review after two years.

To date, 30 entities have been granted access to the Sandbox— four categorized as Low risk (AGS Law, Blue Bee, Firmly, Hello Divorce); 12 as Low/Moderate (e.g., Rocket Lawyer, LawPal, Legal Atoms, Xira); 13 as Moderate (e.g., 1Law, LawGeez, Law HQ, Law on Call) and one as High (AAA Fair Credit). The Innovation Office's most recent monthly report (August 2021) indicates that more than 4,300 legal services have been sought from approximately 3,500 clients. Fifty-six percent of these services have been sought from entities categorized as Moderate risk; most of those have involved use of software for document completion, which comprises approximately 90% of services provided by Sandbox entities to date. Three consumers have submitted complaints, which the Innovation Office touts as "approximately one complaint per 1,500 services delivered." According to the office, "The entity response to harmrelated complaints has been adequate and acceptable as related to mitigation."1

How have Utah practitioners reacted to the Sandbox program? So far, so good. According to the Innovation Office's Executive Director, Sue Crismon, the Sandbox was launched under the guidance of a board consisting of Utah lawyers as well as nationally recognized experts on access to justice through innovation and chaired by a past president of the Utah State Bar. "We knew we would have our detractors," says Crismon. "We decided to take those issues head-on by giving Utah lawyers a seat at the table on the front end. And it doesn't hurt that we have the passionate support of Justice Dino Himonas of the Utah Supreme Court." Crismon emphasizes, "We are not comparing these entities to having a lawyer because the standard we are up against is self-representation and no help. Lawyers feel better about that because we are not trying to take their business."

Viewed from the Sandbox, the future looks bright.